Good morning. May it please the Court, my name is Marty McClain on behalf of Appellant Amber Wright. With me this morning is Co-Counsel Carter Hick. I ask to reserve five minutes at this time. In granting summary judgment below, the trial court committed error in three distinct ways. First, in concluding that the state-created danger exception to Duchenne does not apply. Second, in concluding that the special relationship exception to Duchenne does not apply. And finally, in concluding that Amber Wright's 14th Amendment substantive due process right to bodily integrity was not clearly established as of 2004. This Court reviews the trial court's decision de novo, and because this appeal comes from summary judgment, the factual record is viewed in the light most favorable to the appellant. Starting with the danger creation doctrine, the district court concluded that in order for the danger creation exception to Duchenne to apply to this case, there needed to be some affirmative action on the part of the appellee, Mr. Morrison, in order to invoke that exception to Duchenne. Concluding that there is no evidence of affirmative action on the part of Appellee Morrison, the district court held that the danger creation exception was not applicable. The district court ignored well-settled law that when rendering judgment on summary judgment, the factual record must be viewed in the light most favorable to the appellant. And the record shows ample evidence of affirmative conduct on the part of Morrison that placed appellant in a worse position than she otherwise would have been. First, knowing he was unqualified to perform child- I don't quite get that argument. Well, the argument goes as thus, Your Honor. What did he do to affirmatively place her in danger? He affirmatively placed her in danger. Did he put her back with her father? He accepted an investigation knowing he was unqualified to perform that investigation. That's what got this whole ball rolling. And the fact that he was unqualified to perform this investigation was borne out by the investigation itself. He had never, ever investigated child abuse? I don't know his history for investigating child abuse. You took his deposition, didn't you? Yes. Did you ask him that? No. We asked him, are you qualified to perform sexual abuse investigations in the State of Washington? And two different occasions he said, no, I am not. He explained he didn't have the license to be a qualified forensic investigator. Later in his deposition, after a break was taken, Mr. Morrison did try to rehabilitate his earlier testimony. However, we are again reviewing the record from summary judgment. So your argument is, is that by taking the case, by accepting the assignment to investigate the case, that placed her, that affirmatively placed her in greater danger? Certainly. And the fact can also. After she had already been moved to her grandmother's house. Well, we'll get to her being moved to her grandmother's house, but yes. He didn't. Did he move her to the grandmother's house? He endorsed that placement. Did he? That's not my question. I didn't ask you did he endorse. I asked you, did he move her from her father's house to the grandmother's house? The police originally, the State of Washington, acting through the police, placed Amber with her grandmother. However. That wasn't, so Morrison didn't have anything to do with that decision, is that correct? That is not true. What Morrison did, because Morrison is not involved until the police make the referral to CPS. They're the ones that call in and say, we have information from several. How did she get to her grandmother's house? Initially, the police placed her with her grandmother. Did they take her over to her grandma's? I believe grandma came to the police station and picked her up. Picked her up. Yes. But here's the distinction, Your Honor. You're asking the right questions. Thank you. The State of Washington actually cites in their brief that under Washington law, 1334.06.0, there's an analysis that takes place. That analysis says, where do we put these children? Either we start a dependency or we get to decide if there is a suitable relative placement. The law vests the authority as to where Amber will be placed during this investigation with the State of Washington. Now, plaintiff has come forward with. . . There's a preference in the State of Washington for the children to be placed with their grandmothers. No. I mean, their grandparents. No. Relative. Relative. That's the distinction, because there were several relatives, including her eventual placement, who were available. There was no statutorily preferred placement with the perpetrator's mother during an ongoing investigation. And in this particular. . . The point, though, being. . . So the Affirmative Act here was the endorsement of placing her with the grandma? He left her there. Left her. That's the Affirmative Act. Yes. Okay. And in addition, he relied upon a. . . So did anything happen to her while she was at her grandma's? Yes. What happened to her while she was at her grandma's? While she was with her grandmother, while the investigation is ongoing, grandma and the abuser, the child molester, are pressuring Amber to not disclose what's happening to her. This is precisely. . . And this precise type of fact pattern was recently addressed by this court in the Tomas decision. Now, understandably, Tomas came out after the district court ruled. . . Tomas is a lot different, right? I disagree. Tomas had dealt with custody. I mean with the foster children, a foster placement. It did deal with foster placement, but it also dealt with the danger creation exception. And this is important. There is no. . . Under Ninth Circuit precedent, there is no need to find custody in order. . . In fact, custody is not a predicate for finding danger creation. That goes back to L.W. versus Grubbs. The argument in that case was you need to have some showing that the state had custody of this person in order for danger creation to apply. This court said that's not the case. In it, yes. And that site is L.W. Grubbs, 974 Fed 2nd, 119. I believe that was a 1992 case. However, what Tomas actually said was, and this goes to whether you want to characterize Morrison's action as affirmative or passive, Tomas said that distinction is a distinction without a difference. The real analysis the court must make is did the state actor affirmatively expose an individual to a danger they would not have otherwise have faced? And in Tomas, they even say the state's approval of Monica's foster care license. By the way, that approval wasn't by the state social workers. That was by the superior courts in the state of Washington. And adoption by Fabergast created a. . . So did the child suffer any physical harm or mental injury when she was at the grandmother's house? She did not, other than the fact that she was repeatedly pressured to recant the fact that she was sexually abused and physically abused and fed methamphetamines while she was with her father. However, this is exactly the situation we have in Tomas, where the Ninth Circuit held that Monica was placed in a worse situation by the actions and inactions of the various appellants. That is what we have here. Morrison, while Amber is with her maternal grandmother, both through his actions and inactions, placed her in a far worse position than she would have otherwise have been. As a result, he paved the way for further abuse. That's precisely what this Court held in Tomas. The Descheny case was raised in Tomas. This Court said Descheny does apply. In fact, the exceptions to Descheny apply. So the pressuring of her was abuse? No. The failure. . . You said further abuse. Further abuse that came after she was returned to her father, just like in Tomas. The situation with the social workers in Tomas, they didn't investigate referrals. They did nothing. And what happened as a result of that is further abuse. And again, it says Monica was placed in a worse situation by the actions and inactions of the various appellants. And the worse situation was she was subjected to additional abuse because Morrison, quite frankly, failed to do anything in this case. The only actions he did take also enhanced the danger facing Amber. In particular, by leaving Amber in Grandma Buckner's placement, he actively frustrated the ongoing police investigation. What ongoing police investigation was really going on? Did they talk to anybody else after that night? The guy was first arrested? Yes, they did. The police actually took statements from, I think the record shows, seven, eight, nine children coming forward saying, this is what this man is doing inside of this home. After he was arrested, I believe the police did do a substantial bit more work. But no charges ultimately were filed? For some reason, no. That's, I'll tell you, surprising to the police. But the police did everything they could, and they shared the information they had with Morrison. For whatever reason, Morrison violated DSHS policy in numerous regards, including by ignoring all of this collateral information that was available to him. There were several police statements as well as declarations submitted to the trial court that established these children were ready, willing, and able to speak with Morrison and describe what they'd observed. In addition, plaintiffs have provided expert reports demonstrating that you must speak to collateral contacts. Morrison's duty was not to provide a police investigation so that someone could be prosecuted. His duty was to protect the child. Absolutely. That's a good point, Your Honor. Morrison's duty, and this is described at the excerpts at 149 through 152 and 225, as well as he also describes that he must take measures to protect the children from further abuse. Yes, he made clear in his deposition that his role was distinct from law enforcement. He understood that. However, he did no independent investigation whatsoever. What he did do, he does admit he was not a forensic interviewer. He relied upon Dr. Giraldi to do a sexual assault examination. Well, that's problematic as well because Dr. Giraldi made clear in her report that the patient should not have unsupervised contact with the alleged perpetrator until this situation is fully investigated. That's at the excerpts at page 308. Thereafter, Morrison, in his deposition, he did nothing. He did nothing. Didn't he claim that the mother was the one supervising the visits? He put the mother in charge of supervising them. But that was a supervision, right? No, they were supervised visits because the mother supervised them. He chose the mother. Grandmother. That's another example of an affirmative act. He has the mother. The grandmother. Excuse me. The grandmother supervised the visits between the victim in an ongoing criminal investigation and the perpetrator. And, frankly, this was completely dangerous, as was seen by the conduct of later social workers who said, this is a woman who would, above and beyond everything else, do everything in her power to protect her son. Morrison also acknowledged in his deposition that he made no assessment whatsoever as to whether Ms. Buckner was a biased placement before leaving the children in this home. In addition, Your Honor, you bring up affirmative actions. Morris also misrepresented several elements of his own investigation. He claimed in closing this file that Wright had followed the safety plan to the letter. Well, he couldn't follow the safety plan to the letter because he'd never seen the letter. He had never signed the letter. There's no way that could be true. In addition, he claimed that he had a negligence action pending against the state. Certainly. We do. Is it in Superior Court here in Washington? It is. It's in Pierce County Superior Court. It's recently, the trial's been moved to next May. But it's important to understand there are different remedies available as well. I also point out that Mr. Morrison misrepresented the nature of the allegations he was supposed to be investigating to begin with. He claimed that drug abuse was not an issue he needed to look into. Well, if you look at the referral document, the report he received saying this is what the concerns being raised in the community are, and that's at Excerpts 131 through 140. Want to save some time for rebuttal? Yes, I'll save the remainder of my time for rebuttal. Okay, thank you. May it please the Court, good morning. My name is John McElhenney. I'm an Assistant Attorney General with the State of Washington. There are two points that I hope to develop this morning that will decide this case. The first is that DeShaney is on point and is positive. The second is that social workers are entitled to absolute immunity for filing or not filing a dependency petition in this state. The district court has properly concluded the facts in this case by that the facts in this case are indistinguishable from DeShaney. Therefore, the order granting a defendant Morrison summary judgment should be affirmed. The rights remedy, his rights remedy, as the court has pointed out to counsel, is in state court, and that claim is currently pending. DeShaney held that the act of returning a child to a father who was suspected of abusing a child, the child, and who severely injured the child after he was returned, did not violate substantive due process. The facts in this case are one step removed from DeShaney, because in DeShaney Joshua was actually in temporary custody of the state. What was the relationship between this, I guess, child protective services and the child here after she had been removed to the grandma's? Law enforcement turned the child over to the grandma. Right. The grandma took the child home. Okay. The relationship between the state and the child at that point was the state was in fact the Washington Administrative Code advises that statutorily preferred relative care if the child is there, no dependency need be filed. And as the facts in this case bore out, there was no danger to the child in this case. So there's no special relationship. There's no special relationship. I hate to use the same term. There's no custody of the child when she went to grandma's house. The state didn't put her there. We get something less than custody, correct? Say again? You could have something less than custody, couldn't you? To form a special relationship? Yeah. No, not in this state. Why not? Because this state clearly requires that if the state believes the child is, the health and safety and welfare of the child is in danger, then it must file a dependency petition. Let me ask you this. While she was at grandmother's house, what authority did the state have over the grandmother and how the grandmother treated or took care of her granddaughter? None. She's in private care. She's in her grandmother's care. So what was the deal with the safety plan? Where does that come from? The safety plan is what is required of a CPS investigator when an investigation is initiated. There must be a safety plan to determine whether or not the placement or the place where the child is residing is safe for the child. That was determined to be, the grandmother's home was determined to be a safe place for the child, and, in fact, the facts bore that out. At ER 70, the child advises that none of her claims arise out of it. But the state was also obligated to keep in touch with the grandmother. Is that right? Well, yes. The state will do that because there's an ongoing CPS investigation. So it's because there's an investigation that the state takes all these steps? The referral. Because there's a referral. Referral. The referral, if accepted, leads to an investigation. But the investigation is separate from the custodial, if you will, relationship with the child. Again, the result of the investigation could result in a dependency petition. It could. Yes, sir, it could. Or something less than a dependency petition. If it were determined at some point that the health, safety, and welfare of this child was in danger, then a caseworker under statute may file a petition. That petition must allege that there is reasonable cause to believe that if she's not taken into custody, that she will be harmed. That petition, or the declaration supporting that petition, must also say that there's imminent danger of harm if not taken into custody. So the real point is that there was no custodial relationship at all while the child was at Grandma's house. Did he have a duty to investigate? Say again, sir. Did Morrison have a duty to investigate these issues? Is that what his job was? Morrison had a duty to conduct a CPS investigation. But that CPS investigation, the quality of that investigation, has nothing to do with the constitutional claims in this case. The quality of the investigation is a negligence claim. It's a state claim. And what happened in this case, because there was no custodial relationship with the child at all while she was in Grandma's care, the CPS investigation was concluded as unfounded. So the real claim this child has, the real potential constitutional claim, would have been at that point when she transitioned back to her father's care. The only way the state could have prevented that from happening, in other words, the only way the state could have contravened the father's constitutional right to have familial relationship with the child is to file a dependency petition at that point. There was no basis for that dependency petition to be filed. And furthermore, the decision to file that dependency or not file that dependency is a decision that's entitled to absolute immunity in this circuit. Contra Costa County case is the case that advises that social workers, when they make that decision, they get absolute prosecutorial immunity for making that decision. That's not the essence of their claim. Well, the essence of her claim and what counsel argues is there was state-created danger. But there was no affirmative act. And the test for state-created danger is that there has to be an affirmative act by the state that will create a danger that did not ordinarily exist. Can the act be an inaction? No. No, it can't be. It has to be an affirmative act that creates a danger that didn't otherwise exist. And, in fact, if you look at this, when Amber Wright went back to her father, the fact that a CPS investigation occurred or did not occur did not create a danger, did not create a danger in addition to what she already was facing in her father's home. That's DeShaney. That's why DeShaney controls this case. And without that, and you don't even get into any kind of an analysis of deliberate indifference unless you find that there is a state-created danger, that there's a new danger created by the state. The second prong of that analysis is that in spite of that new danger, we are deliberately indifferent in exposing the child to that danger. So that's why you simply cannot bootstrap the quality of the investigation into some new constitutional claim in this case. You have to go through DeShaney. DeShaney is controlling, and neither one of those exceptions apply because there's no custody of the child. It wasn't established. There was none needed. She was in a safe placement. And when she finally did go back to the dad, absolute immunity because we did not choose to file a dependency petition. I think DeShaney is instructive. The reason why that is is because the purpose of due process clause is the protection of the individual against the arbitrary act of the state. Furthermore, the father has a constitutional right. And while the state, DeShaney at 201 says, while the state may have been aware of dangers that face Joshua in the free world, they play no part in their creation. Let me ask you, isn't it possible for the state to, here there was a police investigation that didn't result in any charges being filed against the father, right? Morrison could have made his own determination independent of that, that she was at risk. Is that right? He could have. He could have decided that the health, safety, and welfare of the child was at risk. That is true. And then he had a decision to make, file or not file a dependency petition. If he, well, first of all, that decision to file or not file, he's entitled to absolute immunity, done. But if he does believe that there's a danger to the child, then he has to go through the steps lined out in statute. He has to file a petition. He has to file a declaration that says there's imminent, one of the terms is there's imminent risk of harm to this child. And then the burden. I guess he would have to relate in there that the police decided that no charges had been filed. Well, he'd have to. He'd have to. And the point of it, the basis for a dependency petition is the facts known at the time, what's available to the state at the time. And the burden that the state must establish is that at the resulting shelter care hearing is whether there is a reasonable cause, reasonable cause to believe a child's health, safety, and welfare will be seriously endangered if not taken into custody. So he has to go through those statutory steps to file it. But let's back up. The decision to file or not to file, absolute immunity. Right. And the only way you get past that is Beltran. We got that point. Yeah. Okay. All right. We got it. And the other point is this, Your Honor. We've said it many times. Well, then, in that case, Your Honor, do you have any further questions? I have no further questions. Thank you. I don't know about my colleagues. I don't have any. Thank you, counsel. Your Honor, we heard the state say there can be no danger creation unless the state affirmatively creates the danger-facing claimant. That's just not the case. The Ninth Circuit, going all the way back to Wood, recognizes it's whether the state actor exposes an individual to danger. The state actor in Wood played no part in creating the high-crime neighborhood where the individual was raped. The state actor in Munger played no role in creating the bitterly cold weather that eventually killed the claimant on that night. The analysis that they invite you to make is simply wrong. It's whether through their acts and, yes, through their inaction, they created a danger that Amber would not otherwise have faced. And the record, viewed in the light most favorable to a plaintiff, is replete with evidence of both his actions and inactions. That exposed Amber to a danger she would not have otherwise faced, in particular, further abuse. In terms of special relationship, they argue that you have to have custody. That's just not the case. The fundamental question, as posed by DeShaney itself, was when a state, by its affirmative exercise of its power, so retains an individual's liberty that it renders him unable to care for himself, an affirmative duty to protect arises, not from the state's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it imposed on his freedom to act on his own behalf. Your Honor, in this case, there's one thing that's not disputed. Amber had no choice about where she was going to live. They didn't ask her. The law that they ask you to apply, that the statutorily preferred placement be with a relative, was one that they applied, and they determined, this is the statutorily preferred relative in whose home you will reside. The fact that they have that power shows that they have an affirmative duty to take precautions to protect Amber while she's in that placement. We ask that you apply DeShaney and reverse and let these claims go to a jury. Thank you. Okay, thank you. Matters is submitted for decision. Thank you, counsel.
judges: Collins, Beezer, Paez